UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PAUL MASTERS,


                              Plaintiff,

                                                    <u>DECISION AND ORDER</u>

                                                    03-CV-6280L


            v.

F.W. WEBB COMPANY,



                              Defendant.
_____


        Plaintiff, Paul Masters, commenced this action against his former employer, F.W. Webb

Company ("Webb"), alleging claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12101 *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* ,

the New York Human Rights Law ("HRL"), N.Y. Exec. L. § 296 *et seq.*, and the Municipal Code

of the City of Rochester, New York.  Webb has moved for summary judgment pursuant to Rule 56

of the Federal Rules of Civil Procedure.



                         **FACTUAL BACKGROUND**

        Webb, a wholesale distributor of plumbing and heating supplies, hired plaintiff in July 1999

as a salesman for the Rochester market.  The person who made the decision to hire plaintiff was Ed

Robicheau, the general manager of the Syracuse, New York office.

Webb had no office in Rochester, which was part of the geographic area covered by the Syracuse office.  Accordingly, plaintiff, though based in Rochester (where he also lived), reported to Robicheau in Syracuse.  Prior to plaintiff's hiring, Webb had no full-time salesmen in Rochester, which had previously been serviced by sales employees operating out of Syracuse.

Plaintiff was terminated in March 2002, at the age of sixty.  Webb contends that the reason for this decision was that the Syracuse branch had been losing money for some time, and that the Rochester market had become particularly unprofitable, due principally to unfavorable economic conditions in the Rochester area.  Defendant does not claim that plaintiff was fired for cause, that his performance had been unsatisfactory, or that he was to blame for the losses in the Rochester market. Webb contends that his position was eliminated outright, and that plaintiff's duties were reassigned to someone in the Syracuse office.

Plaintiff alleges that he was terminated on account of his age and perceived disability. Plaintiff's disability claim is primarily based on the fact that plaintiff had surgery for bladder cancer during his employment with Webb, as well as on certain comments that Robicheau allegedly made indicating that he had concerns about whether plaintiff was physically able to perform his job, due to plaintiff's age and medical problems.  Plaintiff also alleges that he suffered from heart disease and diabetes, although at oral argument on the pending motion plaintiff's counsel conceded that there is no direct evidence that anyone involved in the decision to terminate plaintiff was aware of those conditions.

**DISCUSSION**

**I. Plaintiff's Age and Disability Discrimination Claims–Legal Framework**

Plaintiff's claims of age and disability discrimination are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, plaintiff must establish a *prima facie* case of discrimination by demonstrating:  (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination.  *See Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002); *Regional Econ. Community Action Prog., Inc. v. City of Middletown*, 294 F.3d 35, 48-49 (2d Cir.), *cert. denied*, 537 U.S. 813 (2002).[1]

Once plaintiff has established a *prima facie* case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *See James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000).  The burden then returns to plaintiff to present evidence that the proffered reason is a pretext for discrimination.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 508 (1993).  Although "direct evidence of discrimination is not necessary," *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir.), *cert. denied*, 530 U.S. 1261 (2000), "an employer [is] entitled to judgment ... if the record *conclusively* reveals some other, nondiscriminatory reason for the employer's decision, or if the plaintiff only creates a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (emphasis added); *see also Norton v. Sam's Club*, 145 F.3d 114, 118-120 (2d Cir.)

---

[1]In general, plaintiff's HRL claims are subject to the same analysis as his federal claims. *Ghent v. Moore*, 519 F.Supp.2d 328, 334 (W.D.N.Y. 2007).

(holding that an age discrimination case "may be built entirely out of circumstantial evidence"), *cert. denied*, 525 U.S. 1001 (1998); *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991) (recognizing that employers are unlikely to leave "smoking gun" evidence "attesting to discriminatory intent").

Evidence supporting the plaintiff's *prima facie* case, plus evidence that the defendants' proffered reasons for his termination are false, may, in some cases, be enough to withstand a motion for summary judgment. *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir. 2001). Whether summary judgment is appropriate in a particular case depends upon "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the [defendant's] explanation is false, and any other evidence" that supports the defendant's case. *Reeves*, 530 U.S. at 148-49.

## II. Defendant's Motion

In support of its motion, Webb contends that the undisputed facts show that plaintiff's position was eliminated as a business decision because the accounts that plaintiff serviced in the Rochester area were a financial drain on the company. Webb does not blame plaintiff for that; in fact, as evidence of its nondiscriminatory intent, Webb has submitted evidence that during his employment with Webb, plaintiff got good reviews and was given several salary increases. Webb contends that due to factors outside of plaintiff's or Webb's control (such as cutbacks at Eastman Kodak Co. ("Kodak") in Rochester), the Rochester accounts were simply not profitable enough to justify keeping a full-time salesman in Rochester.

Webb also notes that Robicheau (who was 58 years old when he hired plaintiff) was the same person who made the decision to terminate plaintiff about two and a half years later. Webb thus

relies on the "same actor" inference, *i.e.*, the principle "that when the person who made the decision to fire was the same person who made the decision to hire, especially when the firing occurred only a short time after the hiring, it is difficult to impute to him an invidious firing motivation that would be inconsistent with his decision to hire." *Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir. 2003); *accord Carlton*, 202 F.3d at 137-38.

In addition, Webb states that after plaintiff's termination, the four remaining outside sales employees in the Syracuse branch were all over age 40. Dkt. #110 ¶ 63. Webb has also presented evidence that Robicheau was responsible for hiring a number of 40-and-older employees over the years, including a 61-year-old man hired on February 25, 2002, about two weeks before plaintiff was terminated. Dkt. #111-3 at 5, ¶ 19.

With respect to plaintiff's disability discrimination claim, Webb admits that Robicheau was aware of plaintiff's cancer surgery, but Webb asserts that there is no evidence that plaintiff was in fact disabled or that he was perceived to be disabled by Robicheau. According to defendants, Robicheau had no idea to what extent, if any, plaintiff's surgery or bladder condition affected plaintiff's ability to perform his job, particularly since plaintiff worked 90 miles away from Robicheau's office in Syracuse.

### III. Plaintiff's Response

In opposition to defendants' motion, plaintiff relies to a great extent on certain comments that Robicheau allegedly made about plaintiff's age and medical condition. In particular, he alleges that Robicheau informed plaintiff of plaintiff's termination over dinner at a restaurant in Rochester

around early March 2002.  According to plaintiff's deposition testimony, Robicheau "started off the conversation by saying that he was afraid he was going to have to lay [plaintiff] off" because "management had directed [Robicheau] to cut expenses for the Syracuse branch."  Dkt. #116 Ex. A at 135-36.

Plaintiff also testified that Robicheau and he "discussed at length ... the fact that [plaintiff] had a medical problem and how much that had affected [his] work and how much time [he] had lost, as well as the fact that [plaintiff] was getting older, and between a combination of the two problems, that there was some doubt in [Robicheau's] mind as to whether or not [plaintiff] would be able to continue."  *Id.* at 134.  Plaintiff testified that he "left that meeting with a very strong impression that the major reason [for terminating plaintiff's employment] was not a financial reason but strictly a matter of [his] age and [his] disability–or perceived disability ...," because plaintiff did not consider himself disabled at that time.  *Id.* at 135.

Plaintiff also testified about alleged age-related remarks that Robicheau made at various other times, such as asking plaintiff if he were "getting too old to do this job," or commenting that plaintiff was "slowing down."  *Id.* at 151.  Plaintiff estimated that Robicheau made such comments about "half a dozen" times between late 2001 and plaintiff's termination in March 2002.  *Id.*

With respect to plaintiff's medical condition, plaintiff testified that after his surgery for bladder cancer in February 2001, he was on medical leave for three months, and that afterwards he "had a number of repeat minor surgeries because of problems associated with the major operation."  *Id.* at 157.  He stated that after each of these "minor" surgeries, he would miss several days of work,

and for a while after he returned to work he would have some limitations on his mobility, ability to attend meetings, etc. *Id.* at 158.

Plaintiff testified that "it didn't take long after the first or second minor surgery when [he] started hearing comments from Ed Robicheau like 'Is this ever going to end? ... Are you ever going to get cured, where you won't have to do all of these things?'" *Id.* Plaintiff testified that Robicheau would also say to him, "[I]s there any other things [sic] you can try to make yourself better? The cost is getting astronomical." *Id.* at 159.

Plaintiff has also presented evidence that at a meeting with Kodak representatives after his termination, Steve Perkins, a Webb salesman who had taken over responsibility for plaintiff's former accounts, told the Kodak representatives that plaintiff had left Webb due to his age and health problems.[2] Apparently he was prompted to bring this subject up because in the past, plaintiff had

---

[2]Various witnesses gave different accounts of exactly what Perkins said. Witness Richard Roy (who apparently worked for Kodak, although the deposition transcript excerpts submitted by plaintiff do not make that clear) stated that the only words he specifically recalled Perkins using about this subject were "cost cutting measure," but that he "left the meeting with the belief that at least partially, if not fully, part of the reason was due to [plaintiff's] age or medical condition." Dkt. #116 Ex. L at 10. Steven LeRoy, who worked for Kodak, testified that Perkins stated that plaintiff's medical condition was one of the reasons for his departure from Webb. *Id.* Ex. M at 7. Randy Shaffer, another Kodak employee, testified that Perkins stated that plaintiff "would not be coming back to the company due to his age and the health record or his history of health problems," and, in sum and substance, that "the company [*i.e.*, Webb] had made the decision to let Paul go." Dkt. #116 Ex. N at 11.

Perkins himself testified that Robicheau had directed him to attend this meeting as Webb's representative because Perkins "was taking over the Rochester territory, so [he] was basically the new guy being introduced to the Kodak personnel ... ." Dkt. #116 Ex. K at 15. Perkins testified that, to the best of his recollection, he told the Kodak representatives that plaintiff had voluntarily left Webb "due to health reasons ... ." *Id.* at 17-18. Perkins' testimony was unclear where he had gotten the idea that plaintiff's departure was voluntary. Perkins said that after the meeting he asked Robicheau to clarify the circumstances of plaintiff's departure, and that Robicheau told him that "it was an economic decision." *Id.* at 25.

typically attended those meetings, and the Kodak representatives wondered why plaintiff was not there that day and when he would be coming back.  Dkt. #116 Ex. N at 7.

## IV. Issues of Fact Preclude Summary Judgment

Viewing this evidence in the light most favorable to plaintiff, the non-moving party, I conclude that there are genuine issues of material fact regarding both plaintiff's age and disability discrimination claims.  Defendant's motion for summary judgment must, therefore, be denied.

In its reply papers, Webb repeats its assertion that plaintiff was terminated for purely economic reasons.  With respect to Robicheau's and Perkins's alleged statements concerning plaintiff's age and health, Webb argues that those were, at most, stray remarks that were unrelated to the decision to terminate plaintiff.

The Second Circuit, however, has cautioned that remarks in the workplace should not be "categorized either as stray or not stray and then disregarded if they fall into the stray category." *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 116 (2d Cir. 2007).  *Tomassi* indicates that courts evaluating the significance of such remarks should not employ rigid, all-or-nothing categories, but should take a more nuanced approach, considering the probative value of the remarks in light of a number of factors, such as whether the remarks were made by a person who was actually involved in the decision to terminate the plaintiff, whether the remarks were uttered near the time of the plaintiff's discharge, and whether "other indicia of discrimination" tie the remarks to an adverse employment action.  *Id.* at 115 (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 162-63 (2d Cir. 1998)).

In the case at bar, some of the alleged remarks, particularly those by Robicheau during the dinner at which he informed plaintiff of his impending termination, could hardly be characterized as "stray".  According to plaintiff, Robicheau–the person who made the decision to terminate him–was explaining to plaintiff why he was being terminated, when Robicheau expressed his concerns about plaintiff's age and health, and whether plaintiff could continue to perform his job. Assuming the truth of plaintiff's testimony, those remarks were *directly* related to the decision to terminate plaintiff.  *See Tomassi*, 478 F.3d at 116 (stating that court "d[id] not understand why the district court characterized [plaintiff's supervisor's] remarks as stray," since "[t]he remarks were made by the person who decided to terminate Tomassi" and "could reasonably be construed ... as explaining why that decision was taken").  *See also Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 57 (1st Cir. 2000) (evidence that, shortly before plaintiff's termination, her supervisor had "specifically questioned whether [plaintiff] would be able to manage her work and family responsibilities" supported finding of discriminatory animus); *Shapiro v. New York City Dep't of Educ.*, ___ F.Supp.2d ___, 2008 WL 2414039, at *9 (S.D.N.Y. 2008) ("Direct remarks made by a supervisor are generally held to create an inference of discrimination sufficient to avoid summary judgment"); *Heinemann v. Howe & Rusling*, 529 F.Supp.2d 396, 411 (W.D.N.Y. 2008) (stating that certain alleged remarks were "given added significance by [the speaker's] senior position within [the company] and his role in plaintiff's termination," and because "his alleged statements related to ... a central issue in this case").

Although some of Robicheau's other alleged remarks, and those of Perkins at the meeting with Kodak, were arguably less probative of a discriminatory motive for plaintiff's termination, they

also cannot simply be dismissed as "stray," *Tomassi*, 478 F.3d at 116, and at the very least, they

constitute "other indicia of discrimination" that add further weight to the significance of Robicheau's

alleged statements at dinner. *Id.*[3]

In support of its motion, Webb points to evidence that financial concerns about the

unprofitability of the Syracuse branch, especially the Rochester-area accounts serviced by plaintiff,

played a significant role in plaintiff's termination. It does seem that a perceived need to cut costs

lay at the root of Webb's decision to reduce its sales force within the Syracuse branch.

That economic considerations may have caused Webb to decide that *someone* had to be

terminated, however, does not mean that plaintiff's age or health issues played no role in the decision

that the ax should fall on plaintiff. In that regard, Robicheau's alleged statement about the costs

associated with plaintiff's surgeries becoming "astronomical" suggests that he may have perceived

plaintiff's medical absences as an unacceptable financial burden on the Syracuse branch.[4]

Case law also establishes that the mere fact that genuine economic concerns underlie a

decision to terminate an employee does not necessarily defeat the employee's claim of unlawful

discrimination, since discriminatory animus could still be a motivating factor in the termination

decision. In cases involving reductions in force ("RIFs"), for example, there is often no dispute that

---

[3]Webb has also moved to strike the testimony concerning Perkins's alleged statements to Webb's clients concerning the reasons for plaintiff's departure from Webb. That motion is addressed later in this Decision and Order.

[4]I realize that this alleged statement is subject to more than one interpretation. Assuming that Robicheau made the statement as testified to by plaintiff, he did not expressly state what costs he was referring to, or who was bearing those costs: Webb, plaintiff, the insurance company, or someone else. On defendant's motion for summary judgment, however, the Court must draw all reasonable inferences in plaintiff's favor.

there was a legitimate economic reason for the RIF–*i.e.*, the decision to terminate a certain number

of employees–but that in itself does not insulate the employer from liability for its decision as to

*which* employees to terminate.  *See Tomasso v. Boeing Co.*, 445 F.3d 702, 707 (3d Cir. 2006) ("even

in a genuine RIF (one that is motivated on a programmatic level by economic concerns), individuals

may not be selected for layoff on the basis of age"); *accord Carlton*, 202 F.3d at 136.

RIF cases are also instructive in that there is frequently no dispute in such cases that at least

some of the employees who were terminated in the RIF had been performing their jobs adequately.

As stated, Webb, as evidence of the absence of discriminatory animus on its part, points to the fact

that plaintiff was generally given positive performance reviews during his employment.  Webb

contends that this evidence supports its assertion that plaintiff was terminated for reasons that had

nothing to do specifically with him, but simply because the Syracuse branch in general, and the

Rochester accounts in particular, were losing money.

Again, though, the fact that Webb had not previously expressed any dissatisfaction with

plaintiff's job performance (other than the unprofitability of his accounts, which Webb does not

appear to have attributed to any shortcomings on plaintiff's part), is not dispositive.[5]  As the Third

Circuit has observed, there may be situations in which "even qualified employees are laid off in order

_____

[5]Plaintiff contends that Webb's proffered justifications for his termination have varied
over time, and that in its submission to the Equal Employment Opportunity Commission
("EEOC") in response to plaintiff's administrative charge, Webb asserted that plaintiff was
terminated for poor performance.  I am not persuaded by that assertion.  Although Webb did state
in its EEOC submission that plaintiff's "position was eliminated because he was not able to
sustain the sales necessary to justify a dedicated sales position in Rochester" and that plaintiff
"repeatedly failed to meet Webb's neutral and legitimate sales revenue production standards for
an outside sales position," Dkt. #116 Ex. Q at 1, a reading of the entire document makes clear
that Webb was not blaming plaintiff for that failure, which Webb attributed instead to poor
economic conditions in the Rochester area.  *See id.* at 4.

to reduce personnel." *Tomasso*, 445 F.3d at 707 (noting that plaintiff's supervisor "testified that the individuals selected [by him] for layoff were not bad employees").   Where the employee has presented evidence of discriminatory animus, however, the court cannot simply accept at face value the employer's assertion that the plaintiff was terminated because he was "the worst of the best, *i.e.*, an adequate or even high-performing employee who is under-performing relative to his peers," *id.* at 710 n. 9; *see also Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 n. 11 (9th Cir. 2003) ("Where a plaintiff alleges that she was terminated for unlawful reasons, courts will not accept a reduction in force as the conclusory explanation for the employee's termination").   The question is not simply whether any *non*discriminatory motives played a role in the termination decision, but whether discrimination was a substantial or motivating factor.  *See Owen v. Thermatool Corp.*, 155 F.3d 137, 139 (2d Cir. 1998).

Furthermore, economic pressures on the employer may bring to the surface discriminatory attitudes that had previously lain dormant.  An employer's discriminatory animus might not be apparent during periods when business is going well, and the employer has no occasion to make any personnel changes.  If business takes a turn for the worse, however, and the employer decides to trim its payroll as a cost-cutting measure, the employer's animus could well come into play when the time comes to decide which employees to terminate.  *See Tomasso*, 445 F.3d at 710 n. 9 (stating that "even in a RIF motivated by economic necessity, individual employees may be terminated on the basis of age, and we use the *McDonnell Douglas* framework to lay such discrimination bare").

The "same actor" inference, though not irrelevant, is also not strong enough here to justify the entry of summary judgment for Webb.  For one thing, the inference tends to weaken over time,

particularly in age discrimination cases, since the employee at the time of his termination is older

than he was at his hiring.  *See, e.g., Carlton.*, 202 F.3d at 138.  Moreover, the employer's own

attitudes can change over time; *see Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir.

1995) ("Over the years, an individual may develop an animus towards a class of people that did not

exist when the hiring decision was made"), *cert. denied*, 516 U.S. 1078 (1996).  At any rate,

regardless of the type of discrimination alleged, the inference alone is generally not a sufficient basis

to grant summary judgment for the employer, at least when the employee has proffered evidence of

pretext.  *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003) ("the

same-actor inference, it is insufficient to warrant summary judgment for the defendant if the

employee has otherwise raised a genuine issue of material fact").

　　　　The same-actor inference may generally be drawn only when "the employee was hired and

fired by the same person within a relatively short time span," *Antonio v. Sygma Network, Inc.*, 458

F.3d 1177, 1183 (10th Cir. 2006) (internal quotes omitted), and the shorter the time span, the stronger

the inference.  *Compare Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (applying

inference where the person who caused plaintiff to be fired "was the very person who had hired her

just eight days earlier"), *cert. denied*, 525 U.S. 936 (1996), *with Carlton*, 202 F.3d at 137-38

(passage of seven years between hiring and firing "significantly weakens" the "same actor

inference").  Admittedly, the time between plaintiff's hiring and termination–about two years and

seven months–was not particularly lengthy, but neither was it insignificant.  *See Heinemann*, 529

F.Supp.2d at 412 ("Although plaintiff was not at H & R for a particularly long time–about two years

and nine months–the inference in this case is not as strong as it would be if she had been fired within a few weeks or months after her hiring").

What weakens the inference here even further, however, is that plaintiff's bladder surgery occurred after he was hired by Webb. Thus, his personal circumstances at the time of his termination were significantly different from those that existed at the time of his hiring. *See Feingold v. New York*, 366 F.3d 138, 154-55 (2d Cir. 2004) (stating that the same-actor inference "would not necessarily apply here given the changes in circumstances during the course of Feingold's employment"); *Tellepsen Pipeline Services Co. v. N.L.R.B.*, 320 F.3d 554, 569 (5th Cir. 2003) ("the underlying assumption that discriminatory intent would be manifest at the time of hiring can be overcome where there is change in circumstances between the time of hiring and firing").

Nor do those changed circumstances relate only to plaintiff's disability discrimination claim. As stated, Robicheau's alleged comments to plaintiff, expressing doubt about plaintiff's ability to perform his job, related both to plaintiff's age and health problems. *See* Dkt. #116 Ex. A at 134 (plaintiff's testimony that Robicheau told him that "between a combination of the two problems [*i.e.*, plaintiff's age and medical problems], that there was some doubt in his mind as to whether or not [plaintiff] would be able to continue").

Viewing the evidence in the light most favorable to plaintiff, I believe that a reasonable finder of fact could infer that Robicheau, even if he did not harbor any animus toward older workers in general, believed that the combination of plaintiff's relatively advanced age (sixty at the time of his termination) and his medical problems cast significant doubt on plaintiff's ability to perform his job. Robicheau may have decided that if someone had to be terminated, it made more sense to select an

older employee suffering from health problems, rather than one of the younger, healthier employees. The jury may, of course, accept Webb's version and reject the inferences that plaintiff urges. There is certainly not a little evidence to support Webb's stated reasons. But resolution of the conflicting evidence is for the jury.

There are also disputes here about several other factual areas, which need not be discussed at great length. The parties dispute, for example, whether plaintiff was "replaced" by a younger employee. Webb contends that plaintiff's position as a Rochester-based salesman, devoted full-time to Rochester-area accounts, was eliminated outright, and that his duties were reassigned to a Syracuse-based sales employee, Steve Perkins (who was about 19 years younger than plaintiff). Perkins assumed responsibility for the Rochester accounts in addition to his existing Syracuse accounts. He testified that Robicheau instructed him to "[g]o to Rochester one to one and a half days a week and handle those accounts." *See* Perkins Depo. Tr. (Dkt. #116 Ex. K) at 40.

Whether Perkins "replaced" plaintiff, or simply assumed his remaining duties in addition to his own, is not dispositive, however. Again, the case at bar is akin to cases involving RIFs: even though this case does not involve large-scale, company-wide layoffs, plaintiff was ostensibly terminated not because his performance was unsatisfactory, but because of a perceived need to reduce costs within the Syracuse branch, specifically by eliminating one or more positions, even though the overall duties that needed to be performed remained the same.[6] *See Michas v. Health*

---

[6]One other employee, Paul Hall, an outside salesman in the Controls Division of the Syracuse branch, was also terminated at about the same time as plaintiff. It appears that Hall was 61 at the time of his termination; the complaint alleges that "[t]he defendant's pattern and practice is to discriminate against employees because of their age and medical condition," Complaint ¶ 30, and that "[f]or example, the only [other] individual within Mr. Master's region

(continued...)

*Cost Controls of Illinois, Inc.*, 209 F.3d 687, 693 (7th Cir. 2000) ("In a mini-RIF, a single employee

is discharged and his position is not filled"); *Oil, Chemical and Atomic Workers Intern. Union, Local

7-629, AFL-CIO v. RMI Titanium Co.*, 199 F.3d 881, 885 (6th Cir. 2000) (defining "a reduction in

workforce as a situation where 'business considerations cause an employer to eliminate *one or more*

positions within the company'") (quoting *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir.),

*cert. denied*, 498 U.S. 878 (1990)) (emphasis added).  Regardless of who was terminated, the same

duties would end up being performed by fewer employees.  Literal "replacement" of anyone, then,

in the sense of terminating one person and hiring another to assume his duties, was never the goal;

the only question was who would be terminated, and who would remain.

Under such circumstances, the fact that plaintiff's duties were assumed by a younger

employee (who also continued to perform his own preexisting duties) is not necessarily probative

of discrimination, *see Deebs v. Alstom Transp., Inc.*, 550 F.Supp.2d 385, 390-91 (W.D.N.Y. 2008),

but at the same time, plaintiff need not show that he was "replaced" by a younger individual.  When

an employee's position is eliminated, and the employee's duties are absorbed by one or more of the

employees who remain, the relevant inquiry is not whether the plaintiff was replaced by a younger

employee, but whether the plaintiff was terminated amid circumstances that suggest unlawful

discrimination.  *Yates v. Rexton, Inc.*, 267 F.3d 793, 799 (8th Cir. 2001); *Montana v. First Federal

---

[6](...continued)
that was terminated was a similarly situated individual, 61 years of age, suffering from a
disability."  Complaint ¶ 32.  Defendant appears to acknowledge that Hall was the employee in
question, although it contends that there were legitimate reasons why he was selected for
termination.  I do not believe that this evidence is entitled to much, if any weight here, however.
*See Hughes v. Alabama Dep't of Public Safety*, 994 F.Supp. 1395, 1401 (M.D.Ala. 1998) ("an
employer's treatment of one other employee does not establish a pattern and practice").

*Sav. and Loan Ass'n of Rochester*, 869 F.2d 100, 104 (2d Cir. 1989); *Meng v. Ipanema Shoe Corp.*, 73 F.Supp.2d 392, 397 (S.D.N.Y. 1999); *see also Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1060 (7th Cir. 2008) ("When an employee is dismissed as part of a mini-RIF, [the fourth element of the *prima facie* case is satisfied by a showing] that her duties were absorbed by younger workers who were retained following the mini-RIF").

For the reasons stated, I find that plaintiff has presented sufficient evidence to demonstrate the existence of an issue of fact in that regard. *See Washington v. Garrett*, 10 F .3d 1421, 1434 (9th Cir. 1993) (circumstances created inference of discriminatory intent where black employee was only employee to lose job in supposed reduction in force); *Aludo v. Denver Area Council, Boy Scouts of America*, No. 06-CV-2257, 2008 WL 3480079, at *5 (D.Colo. Aug. 8, 2008) ("When a 'reduction-in-force' includes only one employee–and the one employee is a member of a protected class–this is some evidence of pretext") (citations omitted).

Webb also contends that following plaintiff's termination, the remaining outside sales employees in the Syracuse branch were themselves all within the protected age category: ages 61, 45, 43 and 41. Robicheau Aff. (Dkt. #111 Ex. D) ¶ 16. In addition, defendant contends that over the years, Robicheau has hired a number of individuals over the age of 40, as well as persons with known medical disabilities. While that is some evidence of lack of discriminatory animus, I do not believe that it provides a sufficient basis for the Court to rule as a matter of law that Webb is entitled to summary judgment, when viewed against the evidence that plaintiff's age *did* play a role in his termination. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) ("The

fact that one person in the protected class has lost out to another person in the protected class is thus

irrelevant, so long as he has lost out *because of his age*").

## V. Other Issues Concerning Plaintiff's ADA Claim

With respect to the ADA claim, Webb also contends that there is insufficient evidence that

plaintiff either was disabled, or was regarded by Webb as disabled.  I conclude that there are issues

of fact concerning whether defendant regarded plaintiff as disabled, and that summary judgment on

this claim must be denied for that reason as well.

In order to establish a *prima facie* case of discrimination under the ADA, plaintiff must show:

(1) that Webb is subject to the ADA; (2) that at the time of the relevant events, plaintiff was disabled

within the meaning of the ADA or perceived to be so by Webb; (3) that he was otherwise qualified

to perform the essential functions of the job with or without reasonable accommodation; and (4) that

he suffered an adverse employment action because of his disability.  *Brady v. Wal-Mart Stores, Inc.*,

531 F.3d 127, 134 (2d Cir. 2008).

A person is "disabled" within the meaning of the ADA if he suffers from "a physical or

mental impairment that substantially limits one or more ... major life activities ... ."  42 U.S.C. §

12102(2). "[M]ajor life activities" are "activities that are of central importance to daily life." *Toyota

Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002).  Federal regulations define "major life

activities" to include "functions such as caring for oneself, performing manual tasks, walking,

seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(I); *see EEOC v.

J.B. Hunt Transp., Inc.*, 321 F.3d 69, 74 (2d Cir. 2003).  "The inquiry is not just on the effect an

- 18 -

impairment has on tasks associated with a specific job, but it must focus primarily on whether the claimant is 'unable to perform the variety of tasks central to most people's daily lives.'" *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005) (quoting *Toyota*, 534 U.S. at 200); *see also Muller v. Costello*, 187 F.3d 298, 313 (2d Cir. 1999) ("a limitation on a single, particular job cannot constitute a substantial limitation of the major life activity of working").

I do not believe that plaintiff has presented enough evidence to give rise to any factual issues concerning whether he was disabled for purposes of the ADA. Plaintiff has submitted evidence, mostly in the form of his own affidavit and deposition testimony, that his bladder cancer substantially limited his ability to sleep, engage in physical activity, walk, urinate, and engage in sexual activity. *See* Dkt. #116 Ex. B. Leaving aside the fact that plaintiff has submitted no medical evidence to support those assertions, there is insufficient evidence to show that Robicheau, or anyone else at Webb who was involved in the decision to terminate plaintiff, was aware of any impairments suffered by plaintiff, other than his need to urinate frequently.[7]

Because plaintiff must show that "he suffered an adverse employment action *because of* his disability," *Brady*, 531 F.3d at 134, he must also show that Webb was *aware* of his disability. *See*

---

[7]It is unclear whether presentation of expert or other medical evidence is a *sine qua non* of an ADA claim. *Compare Dietrich v. Du Pont de Nemours & Co.*, No. 02-CV-678, 2004 WL 2202656, at *8 (W.D.N.Y. Sept. 28, 2004) ("Plaintiff's reliance on his own testimony in support of his [ADA] claim is ... deficient because a plaintiff's own testimony, without supporting medical evidence, is an insufficient basis to avoid summary judgment), *with Knox v. City of Portland*, 543 F.Supp.2d 1238, 1251 (D.Or. 2008) ("Plaintiff need not produce medical evidence regarding her impairment; plaintiff's own testimony will suffice") (citing *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1058 (9th Cir. 2005). *See also Provence v. Avon Grove Charter School*, Civ. No. 07-659, 2008 WL 2928314, at *6 (E.D.Pa. July 28, 2008) ("A plaintiff's failure to present expert medical evidence of substantial limitation in a major life activity is not dispositive, but the Court can weigh that failure in determining whether the plaintiff has carried her burden"). I need not resolve that question in this case, however.

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n. 7 (2003) (adverse employment action cannot be the product of discrimination on the basis of a disability if employer was unaware of the disability); *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008) (in order to prevail on ADA claim, plaintiff must show, *inter alia*, that "the employer was aware of her disability"); *Watson v. Arts & Entertainment Television Network*, No. 04 Civ.1932, 2008 WL 793596, at *10 (S.D.N.Y. March 26, 2008) ("It ... appears that notice to the employer of the claimed disability is an essential element of a wrongful termination case under the ADA") (citations omitted).[8]

Plaintiff also alleges that he has suffered from diabetes and heart disease, but there is no evidence that Webb was aware of those conditions, or of any impairments stemming from them. At oral argument, plaintiff's attorney stated that he believed that Webb would have been aware of those conditions from plaintiff's medical records, but there is no evidence to that effect. Plaintiff's attorney conceded that he "d[id]n't think that Ed Robicheau ... was thinking about diabetes" when, in the context of their dinner conversation about plaintiff's termination, Robicheau expressed his concerns about plaintiff's age and medical condition.

---

[8]As stated, plaintiff alleges that his bladder problems affected his ability to engage in sexual activity. In that regard, he also testified that on one occasion when he was at a restaurant having lunch with Robicheau and Perkins, "a couple of nice-looking young ladies came in, and there was conversation between [plaintiff, Robicheau and Perkins] about how nice they looked," and that Robicheau made a comment to plaintiff along the lines of, "What are you looking at? You're too old to cut the mustard anymore." Dkt. #116 Ex. A at 167. When asked at his deposition whether he "perceive[d] that as a comment that was directed in a negative way to [his] age or to any impairment in [his] sexual function," plaintiff responded that he thought "it could have been taken either way." *Id.*

There was nothing in Robicheau's comment, however, that referenced plaintiff's bladder problems, or any *health*-related impairment of sexual function. At most, Robicheau's comment might be interpreted as additional evidence of age bias. At any rate, there is no evidence that any actual or perceived lack of sexual function on plaintiff's part played a role in Robicheau's decision to terminate him.

- 20 -

In addition, plaintiff himself does not appear to believe that *any* of his physical impairments were disabling, at least as far as his job was concerned.  When testifying about the conversation at which Robicheau told him that he was being terminated, plaintiff stated that he got the impression that he was being terminated because of "my age and my disability–or perceived disability, I should say.  I don't feel like I was disabled."  Dkt. #116 Ex. A at 135.  When asked whether his "diabetes condition negatively impact[ed his] ability to perform [his] job duties," plaintiff replied, "No, I don't think so."  *Id.* at 211.

There is evidence that Robicheau was aware of plaintiff's need to urinate frequently, *see*, *e.g.*, Dkt. #116 Ex. A at 168, 172, but in general, that is not considered disabling for purposes of the ADA, *See*, *e.g.*, *Burnett v. LFW Inc.*, 472 F.3d 471, 484 (7th Cir. 2006); *Spruill v. New York City Health and Hospitals Corp.*, No. 06 Civ. 11362, 2008 WL 3911015, at *3 (S.D.N.Y. Aug. 25, 2008), nor has plaintiff shown that this condition was disabling for him, *see Capobianco*, 422 F.3d at 56 (existence of a disability must be determined on a case-by-case basis) (citing *Toyota*, 534 U.S. at 198).

As stated, however, an ADA claim can also be established by showing that the plaintiff's employer "perceived" or "regarded" him as disabled.  The Second Circuit has explained that

> [a] "regarded as" claim turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability.  It is not enough that the employer perceive the employee as "somehow disabled"; the employer must regard the employee as disabled within the meaning of the ADA, *i.e.*, having an impairment that substantially limits a major life activity.

*Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005).

In the case at bar, I find that plaintiff has presented sufficient evidence to give rise to a genuine issue of fact concerning whether Robicheau, who made the decision to terminate plaintiff, regarded plaintiff as disabled, and discriminated against him on that basis.  As stated, "working" is considered to be a "major life activity" for purposes of the ADA.  29 C.F.R. § 1630.2(I).

Although the evidence on this score is not conclusive, it does give rise to an issue of fact. According to plaintiff, Robicheau, during their dinner conversation, expressed his "doubt ... as to whether or not [plaintiff] would be able to continue" working, due to the combination of his age and medical condition.  Dkt. #116 Ex. A at 134.  He also testified that at times, when plaintiff would return to work after having been out for medical procedures, Robicheau would express some frustration with plaintiff's repeated medical absences, asking whether "this [was] ever going to end," and, at times, stating, "You can't attend the [upcoming] meeting; maybe I [*i.e.*, Robicheau] should try to get down there and attend the meeting ... ."  *Id.* at 158.[9]

Drawing all reasonable inferences from this evidence in plaintiff's favor, I believe that a rational finder of fact could conclude that Robicheau regarded plaintiff as substantially limited in his ability to work.  According to plaintiff, Robicheau explicitly questioned whether he would be "able to continue" working, given his health problems.

---

[9]Plaintiff's full testimony was that Robicheau made "comments ... like ... '[M]aybe I should try to get down there and attend the meeting that I should have been been [sic] at anyway'–I shouldn't say that."  Dkt. #116 Ex.A at 158.  Plaintiff's statement, "I shouldn't say that," appears to indicate that Robicheau did not make the latter part of that comment, *i.e.*, that he, Robicheau, should have been at the meeting anyway, and that it was simply plaintiff's subjective belief that Robicheau should have attended the meeting, regardless of whether plaintiff was able to go.

Even assuming that Robicheau made that statement, it is, of course, possible to interpret it in ways more favorable to defendant.  Robicheau may have believed, for example, that plaintiff was still able to work at that time, but wondered how much longer he would be able to carry on.  *See Goldman v. Standard Ins. Co.*, No. C98-1013, 1999 WL 1285444, at *4 (N.D.Cal. Dec. 20, 1999) ("in order to maintain her cause of action under the ADA, plaintiff [whose theory was that she was regarded by defendant as disabled based on defendant's speculation about her future ability to work] must demonstrate that defendant 'regarded' her as being 'presently–not potentially or hypothetically' limited to a major life activity"), *rev'd on other grounds in part*, 341 F.3d 1023 (9th Cir. 2003).  He may also have believed that plaintiff's health problems, even if they were incompatible with his job at Webb, would not have prevented plaintiff from working at other types of jobs.  *See E.E.O.C. v. J.B. Hunt Transport, Inc.*, 321 F.3d 69, 75 (2d Cir. 2003) (for employee to be "regarded" as disabled, employer must perceive him to be significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes) (citing 29 C.F.R. § 1630.2(j)(3)(I)).

It would be improper for the Court to draw such inferences on defendant's motion for summary judgment, however. That is for the jury. The Court's task at this juncture is to draw all reasonable inferences in plaintiff's favor and to determine, in light of those inferences, whether a rational factfinder could return a verdict for the plaintiff.  *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003); *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000).  A reasonable juror could so find but the juror could also reject it.

Robicheau's alleged statements, which were made during a conversation in which he told plaintiff that plaintiff was being terminated, could, on the record before me, be reasonably interpreted

- 23 -

to mean that he believed that plaintiff had already become severely limited in his ability to work.

Even if Robicheau also believed that plaintiff's health was likely to continue to deteriorate, then, that

does not mean that he did not consider plaintiff disabled at that time. *See Winslow v. IDS Life Ins.

Co.*, No. Civ. 3-96-75, 1999 WL 33209625, at *4 (D.Minn. Dec. 14, 1999) ("The fact that ... IDS

regarded Plaintiff as having a possible future disability is not mutually exclusive with a finding that

IDS regards plaintiff as currently disabled. [D]rawing all reasonable inferences in Winslow's favor,

... a reasonable trier of fact could conclude by a preponderance of the evidence that IDS regarded

Winslow as [presently] disabled").

Defendant also contends that the evidence shows that Webb had always accommodated

plaintiff's medical needs in the past, by allowing him to take medical leave whenever he needed to

for surgeries or other medical procedures.  The significance of that evidence, however, is undercut

by Robicheau's alleged comment that the costs associated with plaintiff's surgeries were becoming

"astronomical."  Once again, I believe it is for the trier of fact to determine the reasonable inferences

to be drawn from this evidence.


**VI. Defendant's Motion to Strike**

Webb has also moved to strike certain deposition testimony relied upon by plaintiff.  All of

this evidence relates to Perkins's alleged statements to customers of Webb about the reason for

plaintiff's termination.  Webb's motion is denied.

First, although Webb's motion does not cite any authority for the relief requested, it is

presumably brought pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, which provides

- 24 -

that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." By its terms, however, Rule 12(f) applies only to *pleadings*. *See Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 868 (1st Cir. 1997); *Rochester-Genesee Regional Transp. Auth. v. Hynes-Cherin*, 531 F.Supp.2d 494, 519 n. 17 (W.D.N.Y. 2008); *Johnson v. Manitowoc Boom Trucks, Inc.*, 406 F.Supp.2d 852, 864 n. 10 (M.D.Tenn. 2005), *aff'd*, 484 F.3d 426 (2007). In addition, the rule does not provide for striking material simply on the grounds that it is inadmissible under the Federal Rules of Evidence; rather, the material must be "redundant, immaterial, impertinent, or scandalous." *See Dean v. New York Marriott Fin. Center Hotel*, No. 94 Civ. 4343, 1998 WL 574382, at *4 (S.D.N.Y. Sept. 8, 1998). The material in question does not fall into any of those categories.

I treat defendant's motion, then, as simply asking the Court not to consider the material in question when deciding Webb's motion for summary judgment. *See Nottmeyer v. Precision Alliance Group, LLC*, No. 04 CV 0901, 2006 WL 516729, at *2 (S.D.Ill. Mar. 1, 2006). In deciding whether to grant that request, I am guided by Rule 56(e)'s statement that

> [s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. ... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories or further affidavits.

Applying that rule, courts have also held that otherwise admissible evidence may be "submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form." *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996), *aff'd*, 520 U.S. 781 (1997); *see also Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we

do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its contents"), *cert. denied*, 541 U.S. 937 (2004).

In support of its motion to strike, Webb argues that:  (1) witnesses' subjective interpretations of Perkins's statements concerning plaintiff's departure from Webb are inadmissible under F.R.E. 602; (2) much of the testimony was elicited by leading questions on the part of plaintiff's attorney, and hence is inadmissible under Rule 611(c); (3) Perkins was not authorized to make statements that were damaging to Webb, and therefore his statements are not admissible as admissions of a party-opponent under Rule 801(d)(2)(C); and (4) Perkins's alleged statements did not concern a matter within the scope of his employment.

I note first that "[t]he authority granted in the agency relationship need not include authority to make damaging statements, but simply the authority to take action about which the statements relate."  *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 538 (2d Cir. 1992); *accord Nyack v. Southern Connecticut State Univ.*, 424 F.Supp.2d 370, 375 (D.Conn. 2006).  The fact that Perkins's statements may have been damaging to Webb is therefore of no moment.

I also find that Perkins's statements did concern a matter within the scope of his employment.  According to Perkins himself, he was directed by Robicheau to meet with Kodak representatives to introduce himself as the "new guy."  Perkins was "new" to the client because, up until then, plaintiff had been the Webb salesman handling the Kodak account.  Explaining what had become of plaintiff and why Perkins was taking over for him certainly seems to concern a matter within the scope of Perkins's employment.  *See United States v. King*, 134 F.3d 1173, 1175 n. 1 (2d Cir.) ("Section 801(d)(2)(D) broadens the prior definition of admissible statements of agents from statements 'made

by the agent acting in the scope of his employment' to statements 'related to a matter within the scope of the agency or employment'"), *cert. denied*, 525 U.S. 819 (1998); *Javier v. City of Milwaukee*, No. 07-C-0204, 2008 WL 2412980, at *3 (E.D.Wisc. June 12, 2008) ("the relevant question is whether the statement was related to a matter within the scope of employment, and not whether the statement was made by the employee acting in the scope of his employment").

Defendant's other challenges to this evidence go mostly to matters that would best be dealt with at trial. A witness's subjective interpretation of Perkins's statements or "body language," for example, *see* Dkt. #116 Ex. L at 10, may not itself be admissible, *but see United States v. Tom*, 330 F.3d 83, 94 (1ˢᵗ Cir. 2003) (witness's testimony about his understanding of who drug seller was referring to when he told witness that "he deal with me for years," was admissible as opinion testimony of a lay witness, in part because witness "had an opportunity to observe [drug seller]'s body language and to pick up several nuances that jurors, listening to the tape, might miss"), but that does not mean that the witness could not testify about his recollection of what Perkins said or the manner in which he said it.

Finally, Webb argues that some of this testimony was elicited by leading questions during the witnesses' depositions. Such an objection, however, goes not to the substance of the testimony, but to the form of the examination by plaintiff's attorney. *See Griffith v. Selsky*, 325 F.Supp.2d 247, 249 n. 1 (W.D.N.Y. 2004) (court deciding a motion for summary judgment can consider evidence that would not be admissible at trial, if it appears that admissible evidence will be available at trial) (citing *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985); *but see Morales-Arcadio v. Shannon Produce Farms, Inc.*, No. 605CV062, 2007 WL

2106188, at *11 (S.D.Ga. July 18, 2007) (in deciding motion for summary judgment, court would ignore any of witness's deposition responses to leading questions).  In any event, that objection goes only to a portion of the testimony concerning Perkins's statements.

Furthermore, even if the Court were to ignore all of the testimony about Perkins's statements concerning the reasons for plaintiff's termination, that would not alter my decision on Webb's motion for summary judgment.  This evidence provides some support for plaintiff's claims, but even without it, the other evidence in the record, particularly that concerning Robicheau's alleged statements about why plaintiff was being terminated, would be enough to give rise to a genuine issue of material fact.  This motion would therefore be subject to denial on grounds of mootness in any event.

**VII. Plaintiff's Claim under the Rochester Municipal Code**

The fourth cause of action asserted in the complaint alleges that "[d]efendant violated its obligations under the RMC [Rochester Municipal Code] prohibitions on discrimination and is liable to plaintiff."  Complaint ¶ 45.

Although defendant has not separately moved against this claim on this ground, it must be dismissed because such a claim is barred by the terms of the Code itself.  Although § 63-10(B) of the RMC provides that "[a]ny person claiming to be aggrieved by an alleged discriminatory practice in violation of this chapter shall have a cause of action in any court of appropriate jurisdiction for injunctive relief, compensatory and punitive damages and such other remedies as may be appropriate," § 63-10(D) states that "[n]o cause of action for violation of this chapter shall lie where

- 28 -

the party aggrieved has initiated a civil action in any court based upon the same grievance which is the subject of the cause of action, unless such civil action has been voluntarily discontinued or withdrawn by the party aggrieved." Rochester City Code Online, *available at* http://gcp.esub.net/cgi-bin/om_isapi.dll?clientID=73944&infobase=rochestr.nfo&softpage=Browse_Frame_Pg42. The current language of those provisions was adopted in 2001 by the Rochester City Council, which stated that the City Council sought to "[c]larif[y] that the provisions [of § 63] do not apply if any other cause of action is instituted." Ordinance No. 2001-221 (June 28, 2001), *available at* http://www.cityofrochester.gov/index.cfm?id=777. The relief provided for by § 63 is clearly intended to be alternative, rather than additional to any other causes of action asserted by an aggrieved party based upon the same facts. This cause of action must therefore be dismissed.

## CONCLUSION

Defendant's motion for summary judgment (Dkt. #108) is granted in part and denied in part. Plaintiff's fourth cause of action, asserting a claim under the Rochester Municipal Code, is dismissed. In all other respects, the motion is denied.

Defendant's motion to strike (Dkt. #121) is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      September 8, 2008.

- 29 -